Charles A. SMITH, Respondent/Employee,

v.

CLIMATE ENGINEERING,
Appellant/Employer,

and

CNA/Transportation Ins. Co.,
Appellant/Insurer,

and

Second Injury Fund, Additional Party.

No. 70077.

Missouri Court of Appeals,
Eastern District,
Division Four.

Dec. 17, 1996.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Feb. 5, 1997.

Application to Transfer Denied
March 25, 1997.

Edward M. Vokoun, Evans & Dixon, St. Louis, for Appellant.

Sally I. Heller, Heller & Heller, P.C., St. Louis, for Respondent.

SIMON, Judge.

Climate Engineering (Climate) and CNA/Transportation Ins. Co. (collectively employer-insurer) appeal from a temporary award of the Labor and Industrial Relations Commission of Missouri (Commission) dated

February 8, 1996. The Commission adopted the findings of fact and conclusions of law of the administrative law judge in toto and affirmed the decision awarding Temporary Total Disability from February 18, 1994 through September 30, 1994, medical expenses, and ordered additional medical treatment to employee, Charles Smith (Smith).

On appeal, employer-insurer essentially contend that Commission erred in that: (1) it found and concluded that Smith had sustained an occupational disease, but admitted that it did not know whether or not Smith had an occupational disease and the award was therefore so inconsistent and contradictory as to be invalid because it was based upon speculation; (2) it found as a matter of law that repetitive trauma constitutes an accident rather than an occupational disease where case law recognizes repetitive trauma condition as occupational disease and where the 1993 Amendment to the Act indicates that repetitive trauma conditions are occupational diseases; and where *Wolfgeher* dealt with accidents and not occupational disease; (3) the aggravation of a preexisting condition such as cervical arthritis by nonaccidental conditions of employment constitutes an occupational disease where case law prior to *Wolfgeher* held that such injuries were not compensable as occupational diseases; where *Wolfgeher* did not overrule these decisions; where *Wolfgeher* dealt with the issues of accident and not occupational disease; and where the 1993 Amendments to § 287.020.2 and § 287.067.2 did not change prior case law; (4) even if the aggravation of a preexisting condition by nonaccidental conditions of employment constitutes an occupational disease, the overwhelming weight of the evidence establishes that the claimant did not suffer an occupational disease where substantial and competent evidence through the testimony of Dr. Ollinger, Dr. Petkovich, and Dr. Krettek established that Smith had an ordinary disease of life for which aging, rather that work activities, was the substantial causative factor, and where there was no evidence of a recognizable link between cervical spondylosis and sheet metal work, and where the testimony of Dr. Albanna was speculative and unreliable where he misperceived Smith's work activities and was totally contradictory in finding Smith's work and the aging process were both substantial factors in causing his condition; (5) it found and concluded that Smith suffered an accident by repetitive trauma from flexing his neck backwards and forwards and holding his neck in a hyperextended position which is not supported by his testimony that it was looking upward and working overhead which caused his condition; and (6) it found that Smith's work activities were the cause of his condition where he suffered an accident in 1986 which caused his neck problems after which time he continued to have neck pain, soreness and stiffness, as well as headaches, until the date of his surgery in February, 1994. We affirm.

■■■ Our review is limited to a determination of whether the Commission's award is supported by competent and substantial evidence, viewing the record as a whole. Miller v. Wefelmeyer, 890 S.W.2d 372, 375[2–5] (Mo. App.1994). We review all evidence and inferences in the light most favorable to the Commission's award. *Id.* We defer to the Commission on issues concerning credibility and weight to be given to conflicting evidence and testimony. *Id.* The Commission is free to disregard testimony of a witness even if no contradictory or impeaching evidence is introduced. *Id.* It is in the Commission's sole discretion to determine the weight to be given expert opinions, and that cannot be reviewed by this Court. *Id.* at 376. Where issues involve matters of law, we review independently. *Kintz v. Schnucks Markets, Inc.,* 889 S.W.2d 121, 123[5] (Mo.App.1994).

The record indicates that Smith, who was 61 years old at the time of the hearing, worked in the sheet metal industry for approximately 40 years. He began working for Climate Engineering in November of 1981 as a sheet metal worker, and last worked for it in February of 1994 as a foreman. He had held the position for eight years. As a foreman, about 10% of his day involved keeping time for the men, coordinating the work with other trades, reading blue prints, and making sure everything went on the right perspective. Preparing for a new job entailed taking measurements and ordering supplies. It did not involve overhead work. The longest time

Smith spent preparing for a new job was approximately two to three weeks.

The other 90% of his day involved manual labor, consisting of putting anchors into the ceiling, hanging ductwork, and sealing it. When doing this type of work, about 80% of Smith's time was spent working overhead. By its very nature, installing ductwork required Smith to look upwards with both arms extended above his head and tilt his head backwards. His job also required him to lift on average between 50 to 100 pounds over his head. To help lift this load, Smith would use a duct jack, which would lift the sheet metal close to the ceiling. Smith would then raise the sheet metal off the jack to the ceiling.

In October of 1986, Smith suffered a work related injury. He injured his groin, low back, and neck. His groin and low back pain went away. His neck pain subsided, but never completely went away. He was treated by a chiropractor for two years, but stopped treatment because he felt it was not helping. He did not file a workers' compensation claim for this injury.

Smith testified that his neck pain and headaches dramatically worsened in November of 1993. His headaches became constant and severe and he was unable to turn his head. He reported his problem to Climate. When Climate did not arrange for a doctor's visit, he sought treatment from Dr. Tague.

Dr. Tague first examined Smith on December 14, 1993. Dr. Tague ordered an MRI of the cervical spine. The radiologist's report of January 5, 1994 indicated that Smith had either "an asymmetric disc bulge or tiny disc herniation at C6–7 just to the right of midline with minimal mass effect on the right anterior aspect of the cervical cord." There was also "a diffuse disc bulge and bony spondylosis at C5–6 and C3–4 resulting in very mild spinal stenosis at C5–6 but without significant stenosis at C3–4." Dr. Tague felt that Smith's work environment, where his head was hyperextended had contributed and exacerbated, if not caused, his condition. Dr. Tague referred Smith to Dr. Albanna, a neurosurgeon.

Dr. Albanna, who testified by deposition on behalf of Smith, first examined Smith on January 27, 1994. He diagnosed Smith as having herniated cervical discs and spur formations at C5–6 and C6–7, and recommended physical therapy and traction. However, Smith returned to Dr. Albanna on February 9, 1994 complaining of headaches, neck and arm pain. Dr. Albanna recommended a microdisckectomy and fusion.

Dr. Albanna performed surgery on February 21, 1994, removing disc material at C5–6 and C6–7 and also osteophyte formations at those levels. Dr. Albanna continued to monitor Smith's recovery and prescribed additional physical therapy. The surgery was successful in relieving his headaches, but he continued to have neck stiffness as well as left upper radicular pain. Because of that, Dr. Albanna recommended another MRI and a CAT scan of the neck.

The MRI and CAT scan were performed on July 25, 1994. Dr. Albanna felt that they were essentially unremarkable and showed good fusion. He last examined Smith on August 2, 1994. He spoke with Smith by telephone on September 13, 1994 and recommended two more weeks of physical therapy. At that time, Dr. Albanna had not released Smith to return to work and felt that Smith had not reached maximum medical improvement. Smith has not returned to work for Climate.

Dr. Albanna opined that Smith's many years of physical labor in the sheet metal industry and his posture while performing his duties were a substantial factor in causing his neck injury or contributed to his neck problems for which he had to undergo surgery. He stated that the predominant pathology was the spondylosis, the spur formation, with an operative observation that there were fragments of disc material within those degenerative changes. He also stated that multiple traumas, multiple jolts, whiplashes, or abnormal postures can cause the fragments of disc material to herniate. He opined that 40 years of construction work was a contributing factor to his condition. On cross examination, Dr. Albanna agreed that aging plays a role in Smith's condition. He opined that while Smith's line of work

was a substantial factor in causing the degenerative changes, aging could also have been a substantial factor.

When asked to assume that Smith's duties required him to work on ladders with his head tilted back and looking up and his arms extended above his head, Dr. Albanna reiterated his opinion that Smith's work was a substantial factor in causing his condition. Dr. Albanna reviewed the records of Dr. Boyer, who treated Smith for the accident in 1986, and stated that it did not change his opinion as to the cause of Smith's condition.

Smith was also seen by Dr. Ollinger, Dr. Krettek, and Dr. Petkovich, all of whom testified favorably for employer-insurer, in that work was not a substantial factor in causing Smith's condition.

The Commission found, among other things, that Smith's repeated extending and flexing his neck and holding his neck in a hyperextended position with his arms extended above his head during the last 40 years and during his employment with Climate were substantial factors in aggravating his cervical spondylosis. It also found that the amount of extending and flexing is far greater for sheet metal workers than other occupations, and that Smith's repeated extending and flexing his neck and holding his neck in a hyperextended position with his arms extended was a substantial factor in causing the C5–6 and C6–7 disc herniations. It further found that the aggravation of Smith's cervical spondylosis and the herniations of his C5–6 and C6–7 discs followed as a natural incident of his work, that they were proximately caused by his work, and that his injuries arose out of and in the course of his employment.

In their first point on appeal, employer-insurer essentially contend that where the Commission "finds and concludes that the claimant has sustained an occupational disease but admits that it does not know whether or not the claimant has an occupational disease and asks for further evidence from the parties, the award is so inconsistent and contradictory as to be invalid as based upon speculation."

The Commission stated in its findings of fact and conclusions of law:

> As the issues presented by claimant's request for a temporary award can be resolved without determining whether claimant's cervical spondylosis is an occupational disease and because I would like the parties to submit additional medical evidence on the pathogenesis and pathology of cervical spondylosis, this award will deal with the question of whether Mr. Smith's cervical spondylosis, whether or not it was caused by his work, was aggravated or accelerated by his employment, activities and the conditions of his employment.

In a footnote to that paragraph, the Commission stated:

> The parties are requested to have their experts discuss the pathogenesis and pathology of cervical spondylosis, including the formation of osteophytes, the herniation of discs, and foraminal canal stenosis, how these manifestations occurred in Mr. Smith, the basis for their opinions that these manifestations were caused by or could not have been caused by Mr. Smith's work, and to what extent their opinions are based on any studies and/or their observations of patients.

The Commission further stated that:

> There is some question concerning whether disability sustained by the aggravation of a preexisting condition or disease caused by nonaccidental conditions of employment (repeated or constant exposure to on-the-job hazards) is compensable as an occupational disease.

Then, the Commission came to the conclusion after reviewing case law, that the aggravation of a preexisting condition or the acceleration of a preexisting disease by nonaccidental conditions of employment is compensable as an occupational disease. The Commission also concluded that Smith's condition could be compensable as an accident as long as the requirements of the 1993 amendments have been met.

■ Nowhere in the Commission's findings of fact and conclusions of law did it admit that it did not know whether or not Smith had an occupational disease. The

Commission came to the conclusion that Smith's condition would be compensable as either an accident, or an occupational disease, based on an aggravation of preexisting condition and asked for more information on the pathogenesis of the preexisting condition, cervical spondylosis, in order to determine if that condition was caused by Smith's employment. The finding, in the alternative, was sufficient to support an award of compensation. Employer-insurer's first point is not meritorious.

In their second point on appeal, employer-insurer contend that the Commission erred in finding as a matter of law that repetitive trauma constitutes an accident rather than an occupational disease where case law recognizes repetitive trauma as an occupational disease and where the 1993 amendment to the act indicates that repetitive trauma conditions are occupational diseases; and where *Wolfgeher* dealt with accident and not occupational disease.

Employer-insurer contends that § 287.067.7 (all references hereinafter will be to RSMo 1994 unless otherwise noted) requires a finding that repetitive trauma injuries are to be considered occupational diseases. Section 287.067.7 provides:

> With regard to occupational disease due to repetitive motion, if the exposure to the repetitive motion which is found to be the cause of the injury is for a period of less than three months and the evidence demonstrates that the exposure to the repetitive motion with a prior employer was the substantial contributing factor to the injury, the prior employer shall be liable for such occupational disease.

Nowhere in § 287.067.7 does it require that all repetitive motion injuries be considered occupational diseases.

▆▆▆▆ In *Wolfgeher v. Wagner Cartage Service, Inc.,* 646 S.W.2d 781, 782 (Mo.banc 1983) employee was employed as a truck driver and warehouseman. He and another employee were delivering a refrigerator to a residence as a normal and usual part of their duties. As the two men were moving the refrigerator, employee felt a sharp pain in his back. Employee did not slip or fall nor did he lose his grip. The principal issue in the case was whether or not employee suffered an "accident." Our Supreme Court held that the term "accident" includes not only those injuries which result from an unforeseen and unusual event but also includes those cases where the result, the injury itself, was unforeseen or unexpected. An injury is compensable when the performance of the usual and customary duties of the employee leads to physical breakdown or change in pathology. *Id.* at 784. The focus is on whether an injury has occurred, rather than what immediately preceded the injury. *Id.* at 785. The cause of an injury need not be a single event, but rather the employee is to be compensated for gradual and progressive injuries which result from repeated or constant exposure to on the job hazards. *Id.* "In essence, *Wolfgeher* permits the concept of 'accident' to encompass gradual and progressive injuries resulting from repeated exposure to on-the-job hazards." *Westerhold v. Unitog–Holden Mfg. Co.,* 707 S.W.2d 456, 458[2] (Mo.App. 1986). *Wolfgeher* did not change the necessity that the injury arise out of and in the course of employment. *Id.* The injury must clearly be job related. *Id.*

In *Low v. ACF Industries,* 772 S.W.2d 904 (Mo.App.1989), employee, who had a preexisting heart condition, suffered extraordinary mental and emotional stress related to his job, and that stress caused him to suffer cardiac dysrhythmias. We found that evidence that job stress caused the rhythm of his heart to be disturbed met the "physical breakdown or a change in pathology" test of *Wolfgeher.* We further held that gradual and sustained stress qualified as an "accident" for workers' compensation purposes. *Id.* at 907[6].

In *Kintz v. Schnucks Markets, Inc.,* 889 S.W.2d 121 (Mo.App.1994), claimant, a meat wrapper for nineteen years, sought workers' compensation benefits. Her duties required her to lift 25 to 30 pound trays of meat and place them on a rack. She began having left shoulder problems. Because her injury, a rotator cuff tear and impingement, was work related, we found her injury to be compensable as an accident due to repetitive trauma.

Here, Smith was required to flex and extend his neck as part of his job. Dr. Albanna testified that his work was a substantial factor in causing his condition. Drawing from the principles of *Wolfgeher, Low,* and *Kintz,* we find that the repetitive trauma that Smith experienced constituted a compensable injury which was unforeseen or unexpected, arose out of and in the course of employment, and is clearly job related. Point denied.

In their third point, employer-insurer contend that the Commission erred in finding that the aggravation of a preexisting condition such as cervical arthritis by nonaccidental conditions of employment constitutes an occupational disease where case law prior to *Wolfgeher* held that such injuries were not compensable as occupational disease; where *Wolfgeher* did not overrule these decisions; where *Wolfgeher* dealt with the issue of accident and not occupational disease; and where the 1993 amendments to § 287.020.2 and 287.067.2 did not change prior case law.

Employer-insurer cite *Liebrum v. Laclede Gas Company,* 419 S.W.2d 517 (Mo.App. 1967), in support of their contention. In *Liebrum,* we held that a finding that claimant's sclerotic heart disease was an occupational disease caused by his exposure to ammonia fumes while working on air conditioners was error since sclerotic heart disease was an ordinary disease and thus not compensable under statute excluding ordinary diseases to which general public is exposed and since claimant had preexisting arteriosclerosis with angina pectoris heart disease so that disease for which compensation was sought did not arise out of claimant's employment. *Liebrum,* is distinguishable from the case at bar. In *Liebrum,* we concluded that claimant's condition was not causally connected with his employment. Further, the *Liebrum* court found that claimant's acts of exposing himself to ammonia while servicing air conditioners containing ammonia gas were intentional and thus did not meet the requirements of § 287.020 RSMo 1959 defining accident.

In *Wolfgeher,* our Supreme Court, abandoning the narrow construction of the term "accident" concluded that the term includes not only those injuries which result from an unforeseen and unusual event but also includes those cases where the result, the injury itself, was unforeseen or unexpected. An injury is compensable when the performance of the usual and customary duties of the employee leads to physical breakdown or change in pathology. *Wolfgeher,* 646 S.W.2d at 784. The focus is on whether an injury has occurred, rather than what immediately preceded the injury. *Id.* at 785. The cause of an injury need not be a single event, but rather the employee is to be compensated for gradual and progressive injuries which result from repeated or constant exposure to on the job hazards. *Id.* Thus, as a result of *Wolfgeher,* the judicial interpretation of "accident" has changed.

The 1993 amendments made significant changes in § 287.067, Occupational Disease Defined–Loss of Hearing, Radiation Injury, Communicable Disease, Others, which provides in pertinent part:

1. In this chapter the term "occupational disease" is hereby defined to mean, unless a different meaning is clearly indicated by the context, an identifiable disease arising with or without human fault out of and in the course of employment. Ordinary diseases of life to which the general public is exposed outside of the employment shall not be compensable, except where the diseases follow as an incident of an occupational disease as defined in this section. The disease need not to have been forseen or expected but after its contraction it must appear to have had its origin in a risk connected with the employment and to have flowed from that source as a rational consequence.

2. An occupational disease is compensable if it is clearly work related and meets the requirements of an injury which is compensable as provided in subsections 2 and 3 of section 287.020. An occupational disease is not compensable merely because work was a triggering or precipitating factor.

The amendments to occupational disease indicate the interpretation of compensable injury is to be that as found in § 287.020.

Section 287.020, Definitions, which was also amended in 1993, provides in pertinent part:

2. The word "accident" as used in this chapter shall, unless a different meaning is clearly indicated by the context, be construed to mean an unexpected or unforseen identifiable event or series of events happening suddenly and violently, with or without human fault, and producing at the time objective symptoms of an injury. An injury is compensable if it is clearly work related. An injury is clearly work related if work was a substantial factor in the cause of the resulting medical condition or disability. An injury is not compensable merely because work was a triggering or precipitating factor.

3. (1) In this chapter the term "injury" is hereby defined to be an injury which has arisen out of and in the course of employment. The injury must be incidental to and not independent of the relation of employer and employee. Ordinary, gradual deterioration or progressive degeneration of the body caused by aging shall not be compensable, except where the deterioration or degeneration follows as an incident of employment.

(2) An injury shall be deemed to arise out of and in the course of the employment only if:

(a) It is reasonably apparent, upon consideration of all the circumstances, that the employment is a substantial factor in causing the injury; and

(b) It can be seen to have followed as a natural incident of the work; and

(c) It can be fairly traced to the employment as a proximate cause; and

(d) It does not come from a hazard or risk unrelated to the employment to which workers would have been equally exposed outside of and unrelated to the employment in normal nonemployment life;

(3) The terms "injury" and "personal injuries" shall mean violence to the physical structure of the body and to the personal property which is used to make up the physical structure of the body, such as artificial dentures, artificial limbs, glass eyes, eyeglasses, and other prostheses which are placed in or on the body to replace the physical structure and such disease or infection as naturally results therefrom. These terms shall in no case except as specifically provided in this chapter be construed to include occupational disease in any form, nor shall they be construed to include any contagious or infectious disease contracted during the course of the employment, nor shall they include death due to natural causes occurring while the worker is at work.

An examination of *Wolfgeher*, §§ 287.020.2 and .3; 287.067.1 and .2, indicates that our legislature in enacting the 1993 amendments to § 287.020 essentially tracked the conclusion of our Supreme Court in *Wolfgeher*.

Now the primary focus is the injury itself and whether it arose out of and in the course of the employment. *See* § 287.020.3(2). Therefore, although not immediately preceded or accompanied by an unforeseen and unusual event, an injury is compensable when it is an unexpected result of the performance of the usual and customary duties of an employee which leads to physical breakdown or a change in pathology. *Wolfgeher*, 646 S.W.2d at 784; *See also* § 287.020.3.

Further, as provided in § 287.020.3(1), "[O]rdinary, gradual deterioration or progressive degeneration of the body caused by aging shall not be compensable, except where the degeneration follows as an incident of employment." Thus the Commission was correct in its conclusion that:

... 'gradual and progressive injuries resulting from repeated exposure to on-the-job hazards' is broad enough to now treat aggravations of preexisting diseases or infirmities caused by nonaccidental conditions of employment either as compensable accidents or compensable occupational diseases.

Its conclusion is sustainable by the evidence and is in accordance with the law.

We address employer-insurers' fourth, fifth, and sixth points together. In their fourth point, employer-insurer essen-

tially contend that even if the aggravation of a preexisting condition by nonaccidental conditions of employment constitutes an occupational disease, the overwhelming weight of the evidence establishes that the claimant did not suffer an occupational disease where substantial and competent evidence through the testimony of Dr. Ollinger, Dr. Petkovich, and Dr. Krettek establishes that he had an ordinary disease of life for which aging, rather than work activities, was the substantial causative factor, and where there was no evidence of a recognizable link between cervical spondylosis and sheet metal work, and where the testimony of Dr. Albanna was speculative and unreliable where he misperceived the claimant's work activities and was totally contradictory in finding that claimant's work and the aging process were both substantial factors in causing his condition. In their fifth point, employer-insurer contend that even if repetitive trauma now constitutes an accident under § 287.020.2 RSMo 1993, the Commission erred in finding and concluding that the claimant suffered an accident by repetitive trauma from flexing his neck backwards and forwards and holding his neck in a hyperextended position which is not supported by his testimony that it was looking upward and working overhead which caused his condition. In their sixth point, employer-insurer contend that the Commission erred in finding that claimant's work activities were the cause of his condition where he suffered an accident in 1986 which caused his neck problems after which time he continued to have neck pain, soreness and stiffness, as well as headaches, until the date of his surgery in February, 1994.

Essentially, these points contend that the Commission's award is against the weight of the medical evidence. We disagree. Our review of the record in a light most favorable to the Commission's award indicates the award is supported by competent and substantial evidence. In addition, the Commission found Dr. Petkovich's opinion that Smith did not have a soft herniation to be not credible. Further, while we do not weigh the evidence, we find that the award of the Com-

mission is not contrary to the weight of the medical evidence. Points denied.

Judgment affirmed.

RHODES RUSSELL, P.J., and KAROHL, J., concur.